# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHRISTIAN JAGODZINSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 7378-VCP |
| SILICON VALLEY INNOVATION | ) | |
| COMPANY, LLC, a Delaware limited | ) | |
| liability company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Date Submitted:  April 10, 2015
Date Decided:  August 7, 2015

John D. Hendershot, Esq., Susan M. Hannigan, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Plaintiff Christian Jagodzinski.*

Michael A. Weidinger, Esq., PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, *Attorneys for Receiver Bram Portnoy.*

**PARSONS, Vice Chancellor.**

The defendant limited liability company previously was placed into receivership at the request of the plaintiff, a unitholder. The receiver, then an employee of the plaintiff, has managed the company since his appointment on January 21, 2013. Eventually, the plaintiff and the receiver had a falling out and the receiver ceased to be an employee of the plaintiff, but continued functioning as the receiver. Thereafter, the receiver's compensation was changed, by an order of this Court, from an hourly rate to a flat monthly rate with a contingent bonus. Since then, the plaintiff and the receiver have been unable to work out their differences. The plaintiff brought the pending motion to terminate the receivership, or, alternatively, reduce the receiver's pay.

For the reasons that follow, I conclude that the plaintiff has not made a sufficient showing to warrant terminating the receivership. I agree, however, that the contingent portion of the receiver's compensation should be changed to a net bonus. Additionally, I order the receiver to provide more regular and detailed reporting.

## I. BACKGROUND[1]

The primary legal question presented in this case is whether the receivership in question should be terminated. Much of the testimony presented, however, was

---

[1] The factual record is drawn, in part, from the testimony presented at the hearing held on November 18, 2014. Citations to such testimony are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. The parties did not provide joint exhibits. Accordingly, the receiver's exhibits will be cited as "RX #" and the plaintiff's exhibits will be cited as "PX #."

irrelevant to that issue.[2]  Accordingly, I recite here only those facts necessary to answer the legal questions before the Court.

### A.  SVIC and the Appointment of the Receiver

Plaintiff, Christian Jagodzinski, has been involved in technology companies since the early days of the internet.[3]  In 2000, Jagodzinski invested $1 million in Silicon Valley Innovation Company, LLC ("SVIC" or the "Company"), which was in the business of incubating other startup technology companies.  SVIC raised over $80 million to invest in other companies.  Two of its investments allegedly were extremely successful.  After 2004, however, the Company stopped sending stockholder reports to the equity holders.  Later attempts by Jagodzinski to contact SVIC and determine the state of the Company's affairs were not successful.[4]

---

[2]  To provide but one example, the plaintiff accused the receiver of having taken a two-and-a-half week vacation to the plaintiff's private island in Fiji to celebrate the receiver's birthday.  Tr. 51-52.  The receiver replied that, in fact, he was working for the plaintiff and attempting to sell the island at that time.  To that end, the receiver had arranged for the Discovery Network to do an episode of their show "Island Hunters" on this Fiji island.  *Id.* at 197.  The receiver also testified that several of the seats on the trip to the island were "auctioned off to charity . . . to give [money] to a children's orphanage in Romania, which was approved by [the plaintiff]."  *Id.* at 198.

[3]  Jagodzinski founded an online bookstore in Europe that he states became the largest on that continent; that company was acquired by Amazon in 1998.  *Id.* at 4-5.

[4]  *Id.* at 5-7.

On February 18, 2011, Jagodzinski initiated a books and records action against SVIC in this Court.[5] After dealing with a generally uncooperative SVIC, then managed by SVIC's employee Riverson "Rip" Leonard,[6] I found SVIC in contempt and, pursuant to the Court's equitable powers, appointed Bram Portnoy as a limited receiver of SVIC.[7] Specifically, I tasked Portnoy with collecting the books and records of the Company and authorized him to apply to the Court in a later action to seek additional powers, if necessary.

The Receiver, Portnoy, has a law degree from Bar-Ilan University in Tel Aviv, Israel and an MBA from the International Institute for Management Development in Switzerland. His career has focused on finance. He has held various jobs in investment banking, hedge fund management, and private equity. Sometime in the mid- to late-2000s, Portnoy was hired by Desdemona Capital LLC ("Desdemona"), which manages Jagodzinski's investments.[8] One of those investments was SVIC. The others—such as the private island in Fiji—are not relevant here. Portnoy worked for Jagodzinski until around January 2014.[9]

---

[5]    *Jagodzinski v. Silicon Valley Innovation Co., LLC*, C.A. No. 6203-VCP.

[6]    *See Jagodzinski v. Silicon Valley Innovation Co.*, 2012 WL 593613 (Del. Ch. Feb. 14, 2012).

[7]    RX 1.

[8]    Tr. 135-36 (Portnoy).

[9]    *Id.* at 173 (Portnoy).

3

Large numbers of SVIC's documents apparently were destroyed sometime before Portnoy became the books and records receiver. Portnoy reconstructed the documents from the Company's present and former bankers, lawyers, and accountants.[10] According to both Jagodzinski and Portnoy, the books and records investigation resulted in the discovery of widespread self-dealing and corporate looting.[11] Jagodzinski then filed a new action in this Court, seeking Portnoy's appointment as a full-blown receiver for SVIC. On January 21, 2013, I entered a Joint Stipulation and Receiver Order in this action (the "Receivership Order").[12] That Order appointed Portnoy as a receiver with general powers to manage SVIC and protect its assets. Under the Receivership Order, Portnoy was to be paid $250 an hour.[13]

## B. Capital Calls and Litigation

SVIC's main assets are lawsuits against the Company's former management and advisors. When Portnoy assumed his duties under the Receivership Order, SVIC had minimal cash on hand, making it difficult to finance SVIC's anticipated litigation or pay Portnoy's fees.[14] On January 31, 2013, Portnoy sent a detailed letter to SVIC's unitholders, informing them of the Company's financial situation, his status as Receiver,

---

[10]  *Id.* at 138 (Portnoy).

[11]  *Id.* at 8 (Jagodzinski).

[12]  RX 2 [hereinafter "Receivership Order"].

[13]  *Id.* ¶ 2(j).

[14]  *See generally* RX 3 at 2-4 (describing the Company's limited assets as of February 2013).

the wrongdoing uncovered, and the imminent issuance of new equity interests by SVIC to raise $100,000.[15] As part of that capital call, Jagodzinski purchased his entire allocation and exercised his over-subscription rights.[16] Questions have arisen as to whether the SVIC capital calls, including the January 31 equity raise, were carried out properly. Those issues are not before this Court.[17]

After the capital raise, Portnoy continued the work he had begun as the books and records receiver: reviewing the documents he could gather, interviewing those formerly involved with the Company, and generally investigating claims that SVIC might have. Over the course of 2013 and early 2014, Portnoy caused sixteen separate lawsuits of varying size and importance to be filed against former managers and advisors to the Company.[18] The first such lawsuit appears to have been filed in June 2013.[19] Others

---

[15]     RX 7(J).

[16]     Tr. 23-24 (Jagodzinski).

[17]     Some SVIC unitholders later claimed that they improperly were excluded from the capital calls. *E.g., id.* at 24-27 (Jagodzinski); *id.* at 162-68 (Portnoy). An additional issue is whether the capital calls triggered a conversion of one class of the Company's stock. (For unknown reasons, despite being an LLC, SVIC issues various classes of equity it calls stock, rather than units. *E.g.*, RX 7(L).) The possible conversion issue, which is relevant to voting power in the Company, is not relevant to the question presently before me in this action. It may need to be resolved in the future, however, if it becomes necessary for this Court to decide whether to order an election of a board of directors.

[18]     RX 7(A). I note also that SVIC is a defendant in at least one case. Two individuals sued by Portnoy filed an action in this Court seeking advancement from SVIC. Although the parties in that case stipulated that the plaintiffs were entitled to advancement, I recently held that those advancement claims would be treated as ordinary claims against the receivership estate and would not be entitled

5

followed in August,[20] September,[21] October,[22] and December of that year.[23] Many of these cases were pursued according to contingent fee arrangements with various firms, but some of the smaller cases, which mostly involve collecting unpaid debts owed to SVIC, have been pursued on an hourly fee basis.[24] In April 2013, the Company settled one case. That case appears to have been pending already when Portnoy became the Receiver. It generated proceeds of about $200,000 that were used to continue the investigation and finance related fees and expenses.[25]

The largest lawsuit, however, was filed in January 2014 in Los Angeles (the "California Case").[26] That suit is the main lawsuit against SVIC's former management. Over thirty individuals or entities are named as defendants and that complaint, which contains more than 480 paragraphs, asserts twenty different causes of action. The

---

to any sort of priority payment. *Andrikopoulos v. Silicon Valley Innovation Co.*, 2015 WL 4575605 (Del. Ch. July 30, 2015).

[19]   RX 7(B).

[20]   RX 7(C); RX 7(G).

[21]   RX 7(F).

[22]   RX 7(E).

[23]   RX 7(D).

[24]   Tr. 148-51 (Portnoy).

[25]   *Id.* at 181; RX 7 ¶ 26.

[26]   RX 7(H). The California Case is being handled by the law firm Engstrom Lipscomb & Lack ("ELL"), which Portnoy described as "one of the most prominent firms in the United States" and the subject of the film "Erin Brockovich." Tr. 140.

6

allegations in the California Case are drawn from the evidence unearthed by Portnoy in his investigation. In October and November of 2013, a major breakthrough occurred when, according to Portnoy, Rip Leonard flipped from being an obstructionist to a whistleblower. Leonard supplied Portnoy with a sworn statement supporting SVIC's claim of fraud,[27] and gave Portnoy a number of disks of relevant documents.[28]

Although work on the California Case has been underway for some time, it was only after Leonard began providing assistance that Portnoy and Jagodzinski realized the magnitude of the potential recovery in the California Case, which Portnoy places in the range of $100 million.[29] As discussed *infra*, this figure plays a role in Jagodzinski's effort to end the receivership or else reduce Portnoy's compensation. Finally, I note that, shortly before filing the California Case, Portnoy made a second, larger capital call.[30] Jagodzinski again participated.[31] As a result of the two capital calls, Jagodzinski now controls the largest voting block of SVIC shares.[32]

---

[27] RX 7 ¶ 21.

[28] Tr. 222 (Portnoy).

[29] *Id.* at 221-22.

[30] RX 7(L). This document is incorrectly dated January 1, 2013; the year should be 2014. Tr. 46 (Jagodzinski).

[31] Tr. 46-47.

[32] Because of the confusion over whether the capital calls triggered a conversion, *see supra* note 17, Jagodzinski's exact holdings are not clear. When he filed the motion to end the receivership, he incorrectly claimed to own a majority of the voting power of the Company. Tr. 72-73. Instead, it appears that Jagodzinski controls upwards of 43% of the voting power. Pl.'s Post-Trial Opening Br. 13 n.7.

### C. Portnoy's Compensation

Based on the evidence of record, Portnoy appears to be doing a good job in his role as Receiver. Substantial evidence of possible wrongdoing has been gathered and SVIC's claims are being pursued vigorously in courts across the country. Additionally, SVIC has operated for over two years on roughly $625,000 to cover all of its costs and expenses.[33] The genesis of Plaintiff's motion appears to stem more from the change in the method of Portnoy's compensation than from any concern about the adequacy of his performance.

To frame the dispute, I begin by describing Portnoy's compensation when he worked for Jagodzinski. Portnoy's consulting agreement for Desdemona provided him, initially, with a $5,000 per month retainer. He also was entitled to 10% of any return on a given project, less Jagodzinski's initial investment and a 5% per year return on investment. Portnoy's monthly retainer was to be backed out of any profits.[34] Portnoy

---

[33] This amount is based on the combination of the two capital calls and the settlement proceeds. Plaintiff has not presented sufficient evidence for this Court to find that the total expenses incurred to cover the Receiver's fees as well as SVIC's other expenses, including its bookkeeper, and all of its attorneys' fees and costs, has been anything other than reasonable.

[34] *Id.* at 12-13 (Jagodzinski); RX 7(N). To provide an example: if Jagodzinski invested $1 million for one year and Portnoy produced a 10% return, Portnoy would receive a $3,500 bonus, *i.e.*, $100,000 return less $5,000 (Jagodzinski's 5% annual ROI) less $60,000 (twelve months of retainer fees at $5,000 a month), resulting in $35,000, of which Portnoy takes 10%.

was managing many projects simultaneously for Desdemona. At some point, the monthly retainer was increased to $10,000 and then again to $12,000.[35]

As the Receiver, Portnoy's initial compensation was to be $250 per hour, paid by SVIC.[36] At that time, Portnoy still worked for Jagodzinski via Desdemona and presumably would have been entitled to 10% of Jagodzinski's net recovery from SVIC under the formula just described.[37] In January 2013, Portnoy's first month as the Receiver, he spent 67.05 hours working for SVIC, which entitled him to $16,763.[38] That bill only reflected, at most, two weeks of work, meaning that the full month would have been roughly $30,000.[39] Jagodzinski viewed these fees as unreasonable. At trial, he characterized the $250 an hour fees as part of Portnoy's incessant efforts to increase his own pay and accused Portnoy of using the Receivership Order and threats to run up the hours as a "blackmail tool."[40] Portnoy, by contrast, described Jagodzinski as cheap and as someone who frequently disputes legal bills. I find Jagodzinski's position unreasonable. Brian Rostocki, Jagodzinski's and Portnoy's former attorney in this

---

[35] Tr. 13 (Jagodzinski).

[36] Receivership Order ¶ 2(j).

[37] RX 7(N).

[38] PX 1(L).

[39] Tr. 178-79 (Portnoy).

[40] *Id.* at 17.

matter,[41] testified that, in his experience, hourly fees for receivers range from $200 to $1000 per hour, placing Portnoy's rate on the low end of that scale.[42]

In or around late January or early February 2013, Portnoy and Jagodzinski mutually agreed to modify his compensation—which the Court knew nothing about until the hearing on the pending Motion—such that Portnoy would bill no more than $14,000 a month, regardless of the number of hours he worked.[43] That amount equates to fifty-six hours a month, or fourteen hours a week, at the $250 rate. It is not a coincidence, therefore, that Portnoy's invoices for February, March, and April 2013 all list exactly 56 hours as the time he spent on SVIC.[44] These invoices, however, are not accurate; Portnoy simply stopped recording his time once he hit 56 hours.[45] In any event, based on SVIC's

---

[41]    In January 2013, Jagodzinski executed a conflict waiver allowing his attorney Rostocki also to represent Portnoy as the Receiver in this action. Tr. 92, 104-05 (Rostocki). That waiver did not allow Rostocki to represent Portnoy in connection with the pending motion, however, because Portnoy and Jagodzinski have adverse positions.

[42]    *Id.* at 94.

[43]    *Id.* at 16 (Jagodzinski); *id.* at 171 (Portnoy: "I understood Christian [Jagodzinski] funded the initial lawsuit. I wanted to make Christian happy.").

[44]    PX 1(L).

[45]    Tr. 187-88 (Portnoy). Portnoy also testified that he may have rolled over the extra hours from months with more than 56 hours to months with fewer than 56 hours, so that he could "even it out to 14,000 per month and we could effectively budget." *Id.* at 180. It is not clear how often this happened, though I understand from certain documentary evidence presented that in many months Portnoy worked substantially more than 56 hours. *E.g.*, RX 8 (listing 121.45 hours for October 2014).

relatively strapped cash position, the investors of SVIC appear to have received a financial benefit from this unsanctioned fee arrangement.[46]

Throughout 2013, Portnoy regularly updated SVIC's stockholders as to the progress of the investigation and the lawsuits. Some of these updates were in writing, but Portnoy eventually began providing updates to less than all of the stockholders because some of them were defendants in the California Case and elsewhere. One of those updates occurred in July 2013 and, on August 20, Portnoy circulated a follow-up to the stockholders that recounted the subjects discussed and asked them to complete a short four-question survey (the "Stockholder Survey").[47] The first question asked: "Should we amend the court's order to pay Bram Portnoy a fee of $250 an hour and instead implement a salary of $14,000 a month and 10% of any money recovered?"[48] A second question asked whether Jagodzinski should be repaid his legal fees for pursuing this action; another asked whether the non-contingency attorneys should receive a 1% or 2% bonus for incentive purposes; and a final question asked whether SVIC should attempt to settle the cases quickly or pursue them to maximum recovery.

---

[46]    Tr. 184 (Portnoy: "My SVIC bills were coming at 50,000 [dollars] a month every month for during 2013, but I was only billing 14. I was billing—a third of my SVIC time I was billing. Just not billing two-thirds of what I was doing for SVIC."). At one point, Portnoy evidently contemplated billing SVIC at a later time for his "unbilled time"—*i.e.*, time in excess of 56 hours a month. As explained in note 82 *infra*, Portnoy has since waived any such claim.

[47]    RX 7(O).

[48]    *Id.*

11

Jagodzinski answered yes to the first question, but testified that he thought of it as akin to a hotel survey and believed any specific terms would be worked out later.[49] According to Portnoy, 91% of the Series A preferred respondents,[50] who largely, if not entirely, acquired their preferred stock in the capital calls, approved of the change in compensation structure. Only 72% of the total holdings of Series A preferred shares, spread across 25 to 27 people, answered the survey. Jagodzinski holds 64% of the Series A preferred shares.[51] Thus, the survey fails to reveal the views of a majority of the non-Jagodzinski Series A preferred stockholders.

On November 21, 2013, Portnoy filed a status report in this action, which included a proposed order amending his compensation. No objections from Jagodzinski or anyone else were filed, and on December 3, 2013, I granted that order (the "Amended Order").[52] The Amended Order altered Paragraph 2(j) of the Receivership Order to provide that Portnoy would receive $14,000 per month and "10% of all funds collected by the Receivership Estate going forward."[53] The accompanying report justified the change to

---

[49]     Tr. 29-30.

[50]     The percentages are in terms of the number of shares of Series A preferred for which responses were received, not the number of holders of such shares.

[51]     *Id.* at 239-40. The Stockholder Survey does not reflect the views of the common stockholders. Absent a half-billion-dollar recovery, the common stockholders would be out of the money because of the preferred stock liquidation preference. Consequently, they were not sent the survey.

[52]     RX 4.

[53]     *Id.* ¶ 1.

the Court by describing the Stockholder Survey and stating: "Given the work expended by Portnoy and his fees that are accruing, Portnoy believes it would be beneficial to maximizing the Receivership Estate if he were to be paid a fixed monthly fee (significantly less than the monthly fee that has occurred in the past) with a 10% recovery of future amounts collected for the Receivership Estate."[54] This carefully worded statement technically is true: $14,000 per month is less than the monthly fees that allegedly had "occurred" in the past. It is not correct, however, that SVIC actually paid all of the fees that Portnoy accrued.

I also note that there is a dispute among the parties as to whether the Amended Order is stated in terms of a gross recovery or a net recovery. As written, the Amended Order calls for a contingent fee based on the gross amount the Receivership Estate receives. Jagodzinski assumed, however, it would be a net fee, similar to Portnoy's compensation structure as an employee of Desdemona.[55]

It therefore appears that, throughout 2013, Portnoy unilaterally capped his compensation at $14,000 in order to appease Jagodzinski, despite being entitled under the Receivership Order to $250 for each hour he worked. During that time, Portnoy still worked for Desdemona and believed he also would be entitled to 10% of Jagodzinski's recovery from SVIC. Late in 2013, Portnoy asked for and received the Court's approval of a modified compensation arrangement under which he would receive a salary of

---

[54]     D.I. 47 ¶ 17.

[55]     Tr. 20.

$14,000 per month and 10% of the gross recovery of monies collected by SVIC. Neither Portnoy nor Jagodzinski advised the Court that Portnoy essentially had been proceeding on that basis for most of 2013.

### D. Procedural History

Portnoy stopped working for Desdemona in approximately January 2014.[56] On March 19, 2014, Jagodzinski filed a Motion to Terminate Receivership and Establish Procedures for Discharge of Receiver and Dismissal of the Case. An amended motion followed on May 8, 2014 (the "Motion"). After briefing on the Motion was completed, an argument was scheduled for November 18, 2014. Instead of argument, however, the Court presided over a one-day hearing in which Jagodzinski, Rostocki, and Portnoy testified. Recognizing the largely personal nature of this dispute between Jagodzinski and Portnoy, the Court advised the parties to either resolve their differences or proceed with post-trial briefing. The parties later submitted their post-trial briefs.

Throughout the extended briefing of this matter, no other stockholders of SVIC appeared in support of Jagodzinski's Motion. But, on April 14, 2015, Dr. Jay J. Garcia filed a two-page letter joining in support of the Motion as an interested party.[57] Dr. Garcia contends "that Portnoy is not acting on behalf of all stake holders, and that Portnoy appears to be . . . more interested in collecting fees than he is in recovering and

---

[56]     *Id.* at 173 (Portnoy).

[57]     Garcia has filed a motion to terminate Portnoy's receivership of a different entity in a related case. *Portnoy v. Balance Health Corporation*, C.A. No. 8333-VCP.

14

returning value to stake holders."[58]   Dr. Garcia is a defendant in one of the actions Portnoy filed as Receiver of SVIC.[59]

## II.  ANALYSIS

The primary questions for resolution on Jagodzinski's Motion are: (1) should the receivership be terminated and power returned to the stockholders? (2) if not, should Portnoy be removed as Receiver and replaced with someone else? and, (3) if not, should Portnoy's compensation structure be modified?   I answer the first two questions in the negative.   As to the third, I find it appropriate to modify Portnoy's compensation to make it more of a net contingent fee.

### A.  Standard of Review

The parties have provided remarkably little guidance on the legal standard for terminating a receivership.   Instead, the parties' arguments essentially seek to sway the Court to exercise its discretion in one direction or the other.   Based on my review of the case law, I find the following principles instructive.

I begin by noting that SVIC is an LLC.   Although there are several provisions of the Court of Chancery Rules and the Delaware General Corporation Law ("DGCL") concerning receiverships in the corporate context,[60] there are few statutory provisions

---

[58]   D.I. 100.

[59]   RX 7(C).

[60]   Ct. Ch. Rs. 148-168; 8 *Del. C.* §§ 291-303.

15

regarding receivers for limited liability companies.[61]  Nevertheless, "[t]his Court has the inherent equitable power to appoint a receiver for a Delaware limited liability company even where this remedy is not expressly available by statute or under the operative company agreement."[62]  The standard for obtaining the appointment of a receiver is a high bar, however, usually requiring "'a showing of fraud, gross mismanagement, positive misconduct by corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss which cannot otherwise be prevented.'"[63]  I entered the Receivership Order in this case pursuant to this Court's inherent equitable powers to remedy the serious misconduct that allegedly had occurred and was occurring at SVIC.

Having appointed the Receiver, one question now before me on Jagodzinski's Motion is: what standard applies to terminating a receivership?  Very few cases have addressed this question and those that have did so only in passing.  Black letter authority suggests that the "appointment and discharge of a receiver is ordinarily a matter resting within the sound discretion of the appointing court"[64] and that "[e]quity receiverships

---

[61]    6 *Del. C.* § 18-805 (allowing appointment of a liquidating receiver when the certificate of formation of an LLC has been cancelled).

[62]    *VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *5 (Del. Ch. Apr. 28, 2014).

[63]    *Id.* (quoting *Zutrau v. Jansing*, 2013 WL 1092817, at *5 (Del. Ch. Mar. 18, 2013)).

[64]    RALPH EWING CLARK, A TREATISE ON THE LAW AND PRACTICE OF RECEIVERS 1270 (3d ed. 1959) [hereinafter "Clark Treatise"].

should be terminated as soon as the legitimate purposes of the receivership have been accomplished."[65] From these statements I conclude that, once established, a receivership should continue in the discretion of the Court until its purpose has been fulfilled, at which time the Court ought to discharge the receiver.[66]

The Delaware cases are in accord.[67] Almost a century ago, the Delaware Supreme Court held that the Court of Chancery could discharge a receiver and return a corporation to the stockholders if it "has attained a condition in which it can meet its obligations in the usual course of business, or that there is a reasonable prospect that its business can be successfully continued, notwithstanding any deficiency of assets."[68] Although the appointment and discharge of a receiver rests in the discretion of the Court, the cases also

---

[65] *Id.* at 1271.

[66] The theme that the decision is one of discretion continues throughout the Clark Treatise. For example: "Interventions by stockholders in receivership matters are addressed to the sound discretion of the court appointing the receiver and having control and possession of the property of the corporation." *Id.* at 1441.

[67] *Cf. Liebman & Co. v. Institutional Investors Trust*, 406 A.2d 37, 38 (Del. 1979) ("The appointment of a receiver [p]endente lite is discretionary with the Court . . . and so is a decision to continue or terminate such a receivership. . . . [T]he Chancellor viewed the receivership as necessary for a limited purpose and, when that had been accomplished, he concluded that Court intervention should end. We do not find any basis for reversing judgment."); *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *19 (Del. Ch. Oct. 28, 2013) ("The appointment of a receiver lies within the sole discretion of the Court.").

[68] *Badenhausen Co. v. Kidwell*, 107 A. 297, 297 (Del. 1919). *See also In re Int'l Reins. Corp.*, 48 A.2d 529, 539 (Del. Ch. 1946) (noting that not all receiverships conclude in liquidation and that, "Cases may exist where the court will deem it best to continue to operate the company's business through a receiver and at a later time turn the corporation back to the stockholders and officers as a going concern").

17

suggest that such discretion should be exercised sparingly and with caution. "In short, judicially sanctioned interference with the internal affairs of a corporation is an exceedingly delicate matter and such power should not be exercised except where necessary to protect the vital interests of stockholders."[69]

Regarding the termination of receiverships, this Court has expressed an understandable reluctance to allow interested parties to attempt to terminate a receivership, especially where they might be pursuing ulterior motives. In *Brum v. MacDonald & Eide, Inc.*,[70] the Court denied an effort to terminate a receivership brought by one of the wrongdoers whose actions had led to the installation of a receiver in the first place. There, the court stated that "to discharge the present receiver now and name a successor and to disapprove of counsel's contingent fee contract . . . would tend to destroy the favorable results of fifteen years of work on the part of said counsel . . . ."[71]

### B. Ending the Receivership or Replacing Portnoy

Jagodzinski contends that the receivership should be terminated because the crisis that initially justified placing SVIC into receivership has abated. I am not convinced the situation is as clear as Plaintiff contends. Although it is true that SVIC no longer is being looted, the fact remains that the task of gathering and disposing of SVIC's assets through

---

[69] *Barry v. Full Mold Process, Inc.*, 1975 WL 1949, at *2 (Del. Ch. June 16, 1975).

[70] 1980 WL 268109 (Del. Ch. Nov. 26, 1980).

[71] *Id.* at *4.

18

litigation is ongoing.[72]  There appears to be no dispute among the parties that SVIC is unlikely to return to operations again; the dispute instead is over who should manage the litigation.  For the following reasons, I conclude that Jagodzinski has not made a sufficient showing that terminating the receivership would be in the best interests of SVIC and its stockholders.  Accordingly, I hold that, at least as of this time, the receivership should continue.

Four factors lead me to this conclusion.  First, it was Portnoy who began the investigation of SVIC, did the initial diligence, and launched the various lawsuits.  His institutional knowledge of the situation is unparalleled, except, perhaps, by the lawyers working on the individual cases.  It seems highly probable that Portnoy regularly will be needed in these lawsuits, whether for his knowledge of the facts or as a deponent in the

---

[72]  The parties dispute whether SVIC's insolvency is a sufficient reason to continue the receivership and whether SVIC in fact is insolvent.  Under 6 *Del. C.* § 18-805, a receiver can be installed for an insolvent LLC only upon cancellation of the LLC's certificate of formation.  There are reasons to believe that this provision differs deliberately from its corporate counterpart, 8 *Del. C.* § 279.  *See Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2010 WL 3448227, at *5-6 (Del. Ch. Sept. 2, 2010) (discussing the differences between the receivership provisions in the Limited Liability Company Act and the DGCL).  Regardless, I am wary of Plaintiff's contention that SVIC is not insolvent simply because it can continue to make capital calls.  *See Pope Invs. LLC v. Benda Pharm., Inc.*, 2010 WL 5233015, at *8 (Del. Ch. Dec. 15, 2010) (rejecting, on the evidence presented, the argument that the company was not insolvent because it could engage in capital calls).  If, for example, the receivership terminates and the Company faces large claims for advancement, *see Andrikopoulos*, 2015 WL 4575605, at *6, it is unclear whether SVIC's stockholders would continue funding SVIC.  In any event, because I imposed this receivership pursuant to this Court's inherent equitable powers, I do not attach much weight to the issue of whether or not SVIC is solvent.

various cases around the country.[73] In this respect, efficiency considerations alone counsel in favor of continuing the receivership. Practically, however, this dispute is between Portnoy and Jagodzinski. In view of Jagodzinski's voting control, his displeasure with Portnoy, and their apparent inability to work together amicably, I am concerned that ending the receivership would lead to Jagodzinski controlling SVIC and terminating Portnoy, which seriously could dampen his incentive to cooperate in the litigation, and thereby harm SVIC's interests.

Second, it is not lost on me that Jagodzinski was the party who originally asked the Court to appoint Portnoy. Jagodzinski also indicated on the Stockholder Survey that he favored amending Portnoy's compensation. I find persuasive Portnoy's argument that this Motion has little to do with SVIC and much to do with Portnoy's departure from Desdemona and a personal dispute between the parties. Given that Portnoy became the Receiver because of Jagodzinski and that Jagodzinski initially supported the compensation change he now challenges—evidently before he realized the potential magnitude of the recovery—I am not inclined to make major changes in the status quo absent some compelling explanation, which Jagodzinski has not provided.

---

[73] Although I do not consider them particularly probative, I note that SVIC's attorneys in several of the cases have given Portnoy letters supporting his continued role as Receiver. ELL, the firm pursuing the California Case, submitted one such letter. While disclaiming any "intention to take sides between Mr. Jagodzinski and Mr. Portnoy in their dispute," ELL wrote: "In a case of this magnitude, having a person like Mr. Portnoy as a representative of SVIC for litigation support is critical." RX 7(X).

20

Third, and relatedly, Jagodzinski has shown little or no respect for this Court's orders and has acted as though it is *his* receivership.[74] It is not. Receivers are "officers of the court."[75] In his role as Receiver, Portnoy answers to this Court with respect to SVIC. Jagodzinski's suggestions to the contrary are not only wrong, but also a brazen affront to the Court.

Fourth, I am concerned that ending the receivership would deprive SVIC of the benefits of receivership. At least in part because of this Court's recent ruling in *Andrikopoulos v. Silicon Valley Investment Co.*, SVIC has substantial claims mounting against it. Based on its current asset position, ending the receivership likely would place SVIC at serious risk of promptly being placed into bankruptcy. Such a result hardly seems efficient or desirable and counsels in favor of continuing the receivership.

For these reasons, I find that Jagodzinski has not made a sufficient showing to justify terminating the receivership now. Additionally, and for many of the same reasons,

---

[74]    Jagodzinski unilaterally imposed the $14,000 cap on Portnoy at the beginning of the receivership, notwithstanding that the Receivership Order entitled Portnoy to receive $250 an hour for his work. In addition, the email correspondence reveals that Jagodzinski continued to treat Portnoy as though he controlled him and the receivership. On December 12, 2013, when Portnoy was discussing leaving Desdemona to focus solely on SVIC, Jagodzinski gave Portnoy three salary options, with various fixed rates and a contingent kicker, ranging from "$5,000 per month plus 5% of recoveries" to "$14,000 per month plus a bonus payment when there are substantial recoveries." RX 7(P). By this time, however, the Court already had issued the Amended Order modifying Portnoy's pay. Jagodzinski went on to tell Portnoy: "If you don't believe that is 'market rate', we can take SVIC back out of receivership, and I'll hire someone for that money." *Id.*

[75]    *R.H. McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.*, 190 A. 569, 576 (Del. Ch. 1936).

21

I decline to order the election of some sort of advisory board of directors at this time, although the parties remain free voluntarily to implement such a system. In the future, as the various litigations progress, it may be appropriate for SVIC's stockholders to elect a board to advise the Court, perhaps in conjunction with Portnoy, whether the Company's litigation, particularly the California Case, should be settled or continue. On that issue, the Court will await future developments. Finally, Plaintiff essentially has abandoned his alternative request that Portnoy be replaced with a different receiver. I therefore deem that argument waived.[76]

## C. Altering the Receiver's Compensation

The dispute over the Receiver's compensation almost exclusively concerns the contingent portion. The monthly rate of $14,000 corresponds to 56 hours per month at an imputed rate of $250 per hour. It would not be surprising if Portnoy routinely worked far more than 56 hours in a month. The dispute over Portnoy's right to receive 10% of the monies collected appears to have arisen in conjunction with the possibility of a $100,000,000 collection from the California Case. I credit Portnoy's testimony that he did not know exactly how large the recovery might be when he initially filed the motion to amend the Receivership Order and adopt the current compensation structure,[77] although he probably realized that the upside could be substantial. Indeed, no one really

---

[76] *Zutrau v. Jansing*, 2013 WL 1092817, at *6 (Del. Ch. Mar. 18, 2013); *Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 & n.144 (Del. Ch. Apr. 28, 2003).

[77] Tr. 242 (Portnoy).

22

knows what the ultimate recovery will be. Perhaps underscoring the speculative nature of the $100 million prediction, it is noteworthy that, after the hearing in this matter, the California court dismissed the California Case without prejudice on February 19, 2015, on statute of limitations grounds.[78] SVIC filed a second amended complaint in that action on April 20.[79]

Although I agree that the receivership should continue, I am persuaded that some modifications to the Receiver's compensation are appropriate. Jagodzinski has not provided a convincing explanation as to why the contingency percentage should be reduced or a sliding-scale approach based on the size of the recovery should be substituted for the 10% figure, much less what an appropriate sliding scale would be. The evidence presented by Jagodzinski shows that he believes Portnoy is wildly overpaid and that his compensation needs to be reduced or eliminated.[80] The silent assumption in Plaintiff's argument is that 10% of $100 million is too much; but, if the California case fails, Portnoy could receive 10% of $0 from that litigation. Portnoy contends that both

---

[78] Pls.' Pre-Trial Br., Ex. E, *Andrikopoulos v. Silicon Valley Inv. Co., LLC*, C.A. No. 9899-VCP, D.I. 50 (Apr. 6, 2015). I take judicial notice of this fact. *See In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168-69 (Del. 2006); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 86 A.2d 312, 320 & n.28 (Del. 2004) (noting the propriety of judicial notice of publicly filed documents and collecting cases).

[79] Letter re: the Second Amended Complaint filed in the California Action, Ex. A, *Andrikopoulos v. Silicon Valley Inv. Co., LLC*, C.A. No. 9899-VCP, D.I. 65 (Apr. 24, 2015). I also take judicial notice of this document.

[80] Even after Portnoy left Desdemona, Jagodzinski and Portnoy continued arguing over Portnoy's compensation. In March 2014, a third-party expert prepared a report, at Jagodzinski's request, analyzing Portnoy's pay. RX 7(Q).

23

his monthly compensation and the contingent element of his pay are reasonable and properly align his incentives with those of SVIC's stockholders.

This Court consistently has held that receivers are entitled only to reasonable compensation.[81] Here, I find the receiver's monthly compensation of $14,000 reasonable, notwithstanding Jagodzinski's testimony to the contrary. Indeed, if Portnoy's compensation were limited to the monthly amount, the record indicates that he probably would receive a total payment far below an amount based on the original Court-ordered rate of $250 per hour.

With respect to the contingent portion of Portnoy's fee, the Court's goal is setting the Receiver's compensation in such a manner that his incentives are aligned with the stockholders to seek the best risk-adjusted recovery without granting him a windfall. In the circumstances of this case, I must make that determination against the backdrop of the significantly uncertain potential recovery in the California Case, which offers the greatest upside potential. In that respect, rather than impose a potentially arbitrary step-scale on

---

[81] *See, e.g.*, *Ferry v. Kehnast*, 2008 WL 2154861, at *2 (Del. Ch. May 6, 2008) (discussing the receiver's fees in terms of reasonableness); *Brum*, 1980 WL 268109, at *5 ("In awarding fees to a receiver, this Court traditionally has considered (1) the benefits, if any, gained by his endeavors, (2) the standing and ability of the counsel involved, (3) the difficulties faced, and (4) the contingent nature of the fee and the efforts exerted by counsel."); *see also* 8 *Del. C.* § 298 ("The Court of Chancery . . . shall allow a reasonable compensation to the receiver . . . ."). The older cases use more stringent language, but largely are in accord with the modern reasonableness standard. *See, e.g. R.H. McWilliams*, 190 A. at 576 ("[T]here is no room for the practice of 'vicarious generosity' . . . and that so far as receivers and trustees and their attorneys . . . are concerned, they can neither expect nor be paid more than 'moderate compensation.'") (internal citations omitted).

24

the Receiver's contingent recovery, I find that the 10% figure Jagodzinski and Portnoy jointly asked me to approve is generally reasonable. I do agree with Jagodzinski, however, that a shift to a net recovery, while retaining the 10% contingency, is most appropriate.[82]

Accordingly, from the date of the order implementing the holdings in this Memorandum Opinion onward, Portnoy's contingent recovery will be 10% of the monies collected by SVIC, net of the fees paid to Portnoy henceforth and any out-of-pocket expenses incurred in the administration of SVIC's estate, including non-contingent attorneys' fees and costs and expert witness fees actually paid by or for SVIC, but not including the contingent recovery of the lawyers who have contingent fee arrangements.[83] This arrangement avoids a windfall for Portnoy and better comports with the sort of net contingency arrangements under which Portnoy and Jagodzinski operated with respect to Desdemona, and which Jagodzinski allegedly had in mind when he completed the Stockholder Survey.

---

[82] In retaining the contingency percentage and adopting this relatively modest modification to the compensation structure, I am relying on Portnoy's representations that he will not seek to recover any of the fees he could have earned under the original Receivership Order before the Amended Order was issued, but arguably relinquished by agreeing with Jagodzinski to limit his monthly bill to $14,000. Tr. 206-07. Those fees are waived.

[83] The fees Portnoy already has collected, and the litigation fees and costs already incurred, are governed by the Amended Order and will not be netted out of the ultimate recovery.

25

## D. Receiver Reporting and Future Motions

Although I have ruled largely in favor of Portnoy, I do not condone his fast-and-loose reporting and recordkeeping. In the future, I expect him to record all hours worked. Portnoy also is the receiver in the *Balance Healthcare* matter and he has not objected to my adopting here the reporting requirements imposed in that case. I therefore will impose those requirements in this case, unless the parties agree otherwise, and subject to the following additional requirements. Portnoy will prepare accurate monthly invoices accounting for all hours worked for SVIC. Those invoices shall be included in Portnoy's regular periodic reports. And, absent further order of this Court, Portnoy also must seek approval in this Court of any settlement of the California Case.

Portnoy shall file his first updated report within three months of the issuance of this Memorandum Opinion. He shall file additional updated reports advising the Court as to the status of this case every six months thereafter, or sooner in the event of a material change in the status of the California Case. There may come a time when it becomes necessary to revisit some of the issues addressed herein, such as, for example, the election of a board of directors, or, if Portnoy no longer regularly needs to devote time to SVIC's litigation, his monthly salary. Barring truly exigent circumstances, however, the Court will not entertain any additional motions to modify the receivership, other than a

motion filed by the Receiver,[84] until the Receiver issues his first six-month report, *i.e.*, approximately nine months from now.

## III.     CONCLUSION

For the foregoing reasons, Plaintiff's motion to terminate the receivership is denied, as is his alternative request to appoint a different receiver. To the extent indicated in this Memorandum Opinion, however, I grant Plaintiff's further alternative request to modify the Receiver's compensation structure and impose additional reporting requirements. Counsel shall confer and submit by August 17, on notice, a proposed order implementing the rulings in this Memorandum Opinion.

---

[84]     In that regard, I note that Jagodzinski has represented that Portnoy stated to the stockholders that he intends to seek Court reduction of his salary. No such motion has been made to date.